**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **REUBEN MARTINEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 8687** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Reuben Martinez seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants Plaintiff's motion, denies the Commissioner's motion, and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on April 22, 2009, alleging that he became disabled on October 25, 2008 due to "Open Heart surgery triple b[y]pass, diabetes, [and] carpal tunnel." (R. 150-56, 187). The SSA denied the applications initially on September 9, 2009, and again upon reconsideration on

November 12, 2009.  (R. 88-92, 94-97).  Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Kimberly Nagle (the "ALJ") on January 5, 2011.  (R. 40).  The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from vocational expert Thomas F. Dunleavy (the "VE").  Shortly thereafter, on January 20, 2011, the ALJ found that Plaintiff is not disabled because he can perform a significant number of light jobs available in the national economy.  (R. 12-22).  The Appeals Council denied Plaintiff's request for review on October 6, 2011, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of his request for remand, Plaintiff argues that the ALJ: (1) made a flawed credibility assessment; (2) failed to provide adequate support for the residual functional capacity ("RFC") determination; and (3) relied on improper VE testimony.  As discussed below, the Court agrees that the ALJ's RFC analysis is flawed to the extent that she failed to address Plaintiff's obesity as required by SSR 02-1p.  As a result, the case must be remanded for further consideration of this issue.

## FACTUAL BACKGROUND

Plaintiff was born on July 20, 1962, and was 48 years old at the time of the ALJ's decision.  (R. 42, 150).  He has an eleventh grade education and past relevant work as a chef.  (R. 43, 254).

**A.     Medical History**

**1.     Coronary Artery Disease**

In October 2008, Plaintiff had coronary artery bypass graft surgery at St. James Hospital due to coronary artery disease.  (R. 292-96, 472).  (R. 472). After his discharge, he enrolled in the St. James Cardiopulmonary Rehab Phase 2 Cardiac Rehabilitation program.  (R. 496).  In a letter dated June 25, 2009, the program's Nurse Practitioner and Manager noted that Plaintiff only attended 15 out of 36 sessions in 12 weeks due to an "an injury to his Left wrist and also because of transportation problems."  (R. 433).  Nevertheless, Plaintiff was still "able to make measurable progress."  (*Id.*).

**2.     Diabetes, Carpal Tunnel and Related Conditions**

**a.     2008**

Plaintiff started seeing Stephanie Smith, M.D., of the Cottage Grove Health Center on April 22, 2008 for treatment of diabetes, hypertension and dyslipidemia (high blood cholesterol).  (318, 592).  Dr. Smith recorded Plaintiff's blood and glucose readings, and instructed him to return in three months.  (R. 318).  On July 15, 2008, Plaintiff had an X-ray of his feet due to complaints of pain "for 1 year."  (R. 327).  The test showed "[s]mall calcaneal spurs" in both feet, but no evidence of an acute fracture or dislocation.  (*Id.*).  When Dr. Smith saw Plaintiff on July 30, 2008, she indicated that he had received "injections" for the foot pain.  (R. 315).  During that appointment, Plaintiff complained of "some numbness" in his hands, wrists, ankles and feet, but he exhibited normal strength in all upper and lower extremities.  (*Id.*).

On August 30, 2008, Plaintiff underwent EMG testing at Oak Forest Hospital to evaluate his hand numbness. (R. 303-04). The test showed moderate bilateral carpal tunnel syndrome. (R. 304). When Plaintiff saw Dr. Smith for a routine check-up on November 10, 2008, he reported less numbness in his feet and denied experiencing any pain. (R. 314). He also denied having pain at the next examination on December 8, 2008, but Dr. Smith prescribed him Tylenol #3. (R. 311).

### b. 2009

Plaintiff did not report anything unusual at his February 10, 2009 check-up with Dr. Smith, though she noted that his BMI was 37. (R. 310). At his next visit on April 29, 2009, he said that he sprained his left wrist. (R. 309). An X-ray taken at St. James Hospital was negative but he was wearing a brace. Dr. Smith observed minimal swelling, good range of motion, and strength of 5 out of 5, and she instructed Plaintiff to gradually "return to normal use of wrist/decrease splint use." (*Id.*).

Approximately one month later, on May 30, 2009, Plaintiff had an EMG of his legs, which showed "evidence of motor and sensory polyneuropathy." (R. 306). Shortly thereafter, on July 3, 2009, Plaintiff went to St. James Hospital complaining of left leg pain and swelling. (R. 542). An X-ray taken that day showed a "[s]mall radiopaque foreign body in the anterior soft tissues" of the left leg, but was otherwise normal. (R. 554). A venous Doppler study revealed no evidence of deep vein thrombosis. (R. 555).

Plaintiff saw Dr. Smith again on July 29, 2009, and complained of an injury to his right calf. He said that he felt a "pop" while climbing the stairs with groceries and he noticed swelling and bruising in his foot. (R. 583). Dr. Smith observed "some" swelling and "mild" tenderness, gave Plaintiff Vicodin for his "mild pain," and referred him to an orthopedist. She also referred him to a hand clinic for his carpal tunnel syndrome. (*Id.*). At a follow-up appointment with Dr. Smith on September 14, 2009, Plaintiff reported having right calf pain, especially when climbing stairs. He was occasionally wearing wrist splints, and had scheduled wrist surgery for September 25, 2009, but he had not yet been able to get an appointment with the orthopedist. (R. 582).

There is no evidence that Plaintiff had surgery on his wrists, and he did not mention his wrists to Dr. Smith when he saw her again on November 9, 2009. Instead, Plaintiff complained of a burning pain in his legs, and right knee pain on climbing stairs. (R. 601). The right knee exhibited no swelling at that time, "provocative tests" were negative, and Plaintiff had full strength of 5 out of 5. (*Id.*). Dr. Smith prescribed gabapentin for the diabetic neuropathy, and indicated that Plaintiff had scheduled an appointment with an orthopedist for February 2010. (*Id.*).

On December 3, 2009, Dr. Smith completed a Physical Residual Functional Capacity Questionnaire of Plaintiff for the Department of Disability Determination Services ("DDS"). (R. 592-96). She began by identifying Plaintiff's various diagnoses, including (1) coronary artery disease, status post coronary artery bypass surgery; (2) diabetes; (3) mixed dyslipidemia; (4) bilateral

5

carpal tunnel syndrome; (5) chronic right leg pain; and (6) diabetic peripheral neuropathy. (R. 592). Dr. Smith then discussed Plaintiff's symptoms of numbness in his hands and feet, wrist pain, and right knee/calf pain. In response to a question about the clinical findings and objective signs of Plaintiff's conditions, Dr. Smith referred to the July 3, 2009 X-ray showing the presence of a radiopaque foreign body in his left leg. She also stated that an "orthopedic evaluation [wa]s pending," and that Plaintiff was "scheduled for carpal tunnel surgery." (*Id.*).

Dr. Smith opined that Plaintiff can walk less than one block, sit for 2 hours at a time before needing to get up, and stand for 10 minutes at a time before needing to sit down. (R. 593). He can tolerate only minimal walking and is "unable to work in a competitive environment . . . due to significant upper and lower extremity neuropathy." (R. 594). Dr. Smith stated that Plaintiff can never stoop, crouch, squat, climb ladders or climb stairs, and can only rarely twist. He also has no ability to use his hands "in [a] competitive work environment due to significant carpal tunnel syndrome necessitating surgery." (R. 595). Dr. Smith opined that on average, Plaintiff would miss more than four days of work per month due to his impairments. (*Id.*).

### c.    2010

At Plaintiff's routine check-up with Dr. Smith on February 17, 2010, he reported that he had missed his orthopedist appointment, apparently because his calf injury had "healed on [its] own." (R. 599). He continued to complain of persistent knee pain, but Dr. Smith did not see any swelling, and Plaintiff once

again exhibited full strength and negative "provocative tests." As for Plaintiff's carpal tunnel syndrome, it appears that he lost the referral for the hand clinic and needed Dr. Smith to send a new one. (*Id.*). There is no mention of wrist surgery. Dr. Smith did, however, diagnose Plaintiff with obesity, and indicated that weight loss was "strongly recommended." (*Id.*).

On August 27, 2010, Plaintiff went to the Oak Forest Hospital emergency room complaining of swelling in his lower legs. (R. 610-11). An ultrasonograph was normal, and a chest X-ray showed no evidence of "an active intrathoracic process." (R. 620, 622).

### 3. State Agency Examinations

In response to Plaintiff's April 2009 application for disability benefits, Muhammad Rafiq, M.D., conducted an Internal Consultative Examination of Plaintiff for DDS on August 29, 2009. (R. 559-62). Plaintiff told Dr. Rafiq that he feels numbness and tingling in his feet, with pain radiating from his knees to his feet. He also has difficulty grabbing and holding objects, and occasionally drops things due to his carpal tunnel syndrome. (R. 559). Plaintiff said that he can walk up to six blocks, stand and sit for 30 minutes at a time, and climb one flight of stairs "with difficulty." He can also cook and vacuum "normally," lift up to 10 pounds, bathe and dress independently, and shop "with company." (R. 560).

On examination, Dr. Rafiq observed that Plaintiff is obese with normal heart rhythms and sounds. (R. 560-61). He was able to get on and off the exam table with no difficulty, he could walk more than 50 feet without support, and he had a non-antalgic gait. His grip strength was normal in both hands, and he

demonstrated normal ability to grasp and manipulate objects with both hands. Dr. Rafiq noted that Plaintiff exhibited normal range of motion in his extremities, and a straight leg raise test was negative bilaterally. Tinel's and Phalen's signs, however, were positive bilaterally.[1]  (R. 561).  Dr. Rafiq summarized Plaintiff's "problems" as (1) coronary artery disease, status post coronary artery bypass graft surgery; (2) peripheral neuropathy; and (3) carpal tunnel syndrome bilaterally.  (R. 562).

The following month, on September 4, 2009, C. A. Gotway, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff for DDS.  (R. 564-71).  Dr. Gotway stated that Plaintiff can occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; sit, stand and/or walk for 6 hours in an 8-hour workday; and push/pull and manipulate objects without limitation.  (R. 565, 567).  Dr. Gotway relied extensively on the predominantly normal findings recorded by Dr. Rafiq, and concluded that Plaintiff "is doing fine, not credible currently."  (R. 571).  Virgilio Pilapil, M.D., affirmed Dr. Gotway's findings on November 11, 2009.  (R. 588-90).

## B.    Plaintiff's Testimony

In a July 6, 2009 Function Report completed in connection with his application for disability benefits, Plaintiff stated that he went outside "every day,"

---

[1]    A "Tinel's sign" tests for an irritated nerve.  "[I]n carpal tunnel syndrome, . . . the test for Tinel's sign is often positive, eliciting tingling in the thumb, index, and middle fingers."  (http://www.medterms.com/script/main/art.asp?articlekey=16687, last viewed on November 1, 2012).  A "Phalen's sign" is another test to detect carpal tunnel syndrome.  (http://medical-dictionary.thefreedictionary.com/Phalen's+maneuver, last viewed on November 1, 2012).

and was able to walk, ride in a car, and use public transportation. (R. 196, 200). He also shopped for food once a week for an hour, and spent time with others, including going out to eat with family once a week. (R. 196-97). Plaintiff stated that he had no problem with personal care at that time, could make himself sandwiches and frozen meals, and helped with the sweeping, mopping and laundry. (R. 204-05). At the same time, he could only lift up to 10 pounds, and walk half a mile with a 5 to 10 minute rest after a quarter mile. He also reported problems lifting, squatting, bending, standing, walking, kneeling and stair climbing. (R. 198). In a Physical Impairments Questionnaire completed the same day, Plaintiff stated that due to wrist pain, he had trouble using a can opener and knives, opening lids or food packages, and carrying groceries and laundry. (R. 202). He also experienced numbness in his legs and feet, making it difficult to get in and out of a car, get up from a chair, or get out of bed. (R. 203).

Plaintiff completed a second Function Report and Physical Impairments Questionnaire on October 15, 2009. (R. 226-36). He said that at that time, he spent his days washing up, getting dressed, lightly cleaning the apartment, calling family, eating, and watching television. (R. 226). He could not sleep through the night due to pain in his legs, back, chest and arms, but he went out "daily," shopped for groceries twice per week, and spent time with others once or twice a week in person or on the phone. (R. 227, 229-30). In this report, Plaintiff stated that he could only walk four blocks before needing to stop and rest for 5 or 10 minutes, and he complained of neuropathy, sciatica, eye trouble and knee pain in addition to carpal tunnel syndrome, heart surgery, and diabetes. (R. 231).

He also reported wearing arm splints for the previous 2 1/2 months, and using crutches "as needed" due to a June 2009 leg sprain. (R. 232, 234). Plaintiff noted that his legs "can give out" on him, and said that he has to get up every 20 minutes or so due to back and leg pain and numbness in his feet. (R. 232, 236).

At the January 5, 2011 hearing before the ALJ, Plaintiff testified that he stopped working as a chef in July 2008 when he was fired over a scheduling issue. (R. 44). He collected unemployment insurance from August 2008 until June 2010, but has no other source of income except food stamps. (R. 43, 45-46). In that regard, Plaintiff lives in an apartment with his brother "rent free." (R. 43).

Plaintiff stated that as a result of the neuropathy, he wakes up several times during the night with numbness in his feet and knees, and he has a lot of knee pain when climbing stairs. (R. 46, 49). He falls between 18 and 20 times a month when his leg "goes out," but his doctor told him not to use a cane because he is "too young . . . to get dependent on a cane." (R. 62). Plaintiff tries to relieve the pain by taking prescription ibuprofen and gabapentin, rubbing his knees, and taking "little walks." (R. 49-52). He also has to elevate his legs 2 or 3 times a day for an hour each time. (R. 61). Despite these measures, he still experiences pain at a level of 7 or 8 out of 10, "like a poking, like a needle." (R. 50, 64). Plaintiff said that his conditions, including heel spurs, prevent him from sitting for more than 20 or 30 minutes at a time, or standing for more than 10 or 15 minutes. (R. 50-51, 64).

With respect to the carpal tunnel syndrome, Plaintiff testified that he is limited to lifting 15 pounds with his right hand and 10 pounds with his left hand. (R. 50). He feels pressure and numbness in his lower arms and hands, and his symptoms have gotten worse over time. (R. 56-57). Though he was scheduled for surgery, "the doctor was a no show" and he "never heard from them again as far as scheduling me for an appointment after that." (R. 57). Plaintiff said that he wears wrist braces four times a week, but does not sleep with them on. (R. 58).

On a typical day, Plaintiff watches television, takes naps, prepares frozen meals or sandwiches for himself, and reads. (R. 46-47). He also cares for his personal grooming (dressing, shaving), and visits with family and friends three times per week. (R. 48, 60-61). Five times a month, however, Plaintiff "cannot get going" due to pain and just stays in bed. (R. 62-63). Plaintiff tries to help his brother with dishes but the activity aggravates his neuropathy and carpal tunnel syndrome. He does some dusting and sweeping, but he cannot mop, clean, shop or do laundry. (R. 59, 60).

## C.    Vocational Expert's Testimony

Thomas F. Dunleavy testified at the hearing as a VE. The ALJ asked him to consider a hypothetical person of Plaintiff's age, education and past work experience who can engage in light work and frequently perform fingering movements, but can never climb ladders, ropes or scaffolds, can only occasionally climb ramps or stairs, and must avoid concentrated exposure to excessive vibrations and walking on uneven and rough surfaces. (R. 69-70). The VE testified that such a person would not be able to perform Plaintiff's past

work as a chef, but could still work as a cashier (at least 75,000 jobs available), housekeeper (at least 4,000 jobs available) or cafeteria attendant (at least 4,000 jobs available).  (R. 70-71).  The person could perform these jobs with a sit/stand option, as long as he was not off task more than 10 percent of the time.  (R. 73).  If, however, the person also required unscheduled, 15-minute breaks to elevate his feet, then there would be no jobs available.  (R. 71).  Employment would also be precluded for an individual with the limitations set forth in Dr. Smith's December 2009 assessment.  (R. 72).

The VE testified that the jobs he identified are consistent with the Dictionary of Occupational Titles ("DOT"), except that the DOT does not include a sit/stand option.  (R. 73).  The VE explained that his assessment of the added sit/stand option was based on his "observations, extensive experience in the vocational rehabilitation field, [and] hundreds if not thousands of discussion[s] with other VEs on these issues."  (R. 74).

## D.    Administrative Law Judge's Decision

The ALJ found that Plaintiff's status post triple bypass open heart surgery, diabetes mellitus, neuropathy, bilateral carpal tunnel syndrome, knee pain, edema, hypertension and calcaneal spurs in both feet are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 15).  After discussing the medical and testimonial evidence in detail, the ALJ determined that Plaintiff has the capacity to perform light work with the following restrictions: he can only occasionally climb ramps and stairs; he can never climb ladders, ropes or scaffolds; he must

have a sit/stand option "that would not result in being off-task more than ten percent of the time"; he "is limited to jobs that require only frequent bilateral fingering"; he must avoid concentrated exposure to excessive vibration; and he cannot walk on uneven surfaces.  (*Id.*).

In reaching this conclusion, the ALJ gave little weight to Dr. Smith's opinion that Plaintiff is incapable of gainful employment, describing it as inconsistent with the doctor's own treatment notes and the medical evidence as a whole.  (R. 19).  Though Dr. Smith stated that Plaintiff cannot stand for more than 10 minutes and can walk less than one city block, her treatment notes repeatedly indicated that Plaintiff exhibited full strength in his legs.  (R. 20).  The notes also "do not reflect the same extreme limitations that are contained in the [RFC] questionnaire."  (*Id.*).

With respect to Plaintiff's testimony, the ALJ concluded that his statements regarding pain and limitations were "less than credible."  The ALJ noted that Plaintiff left his job due to scheduling issues, not because of his medical conditions, and that he held himself out as being able to work while he collected unemployment insurance for nearly two years.  (*Id.*).  In addition, Plaintiff's treatment was "routine and conservative"; for example, he never rescheduled surgery to address his purportedly disabling carpal tunnel syndrome.  Finally, the ALJ described Plaintiff as not compliant with prescribed treatment, observing that he attended less than half of his cardiac rehabilitation sessions.  (*Id.*). Nevertheless, the ALJ afforded Plaintiff "the benefit of the doubt" in determining

his RFC, and imposed greater restrictions on his functionality than Dr. Gotway. (R. 19).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing a significant number of jobs available in the national economy, including cashier, housekeeper and cafeteria attendant. The ALJ acknowledged that the DOT does not provide for a sit/stand option for these jobs, but she found the inconsistency "reconciled" by the VE's testimony that he "based his answer regarding the number of jobs available on his years of experience in the vocational field."  (R. 21).  The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g).  In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted).  Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations."  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astru*e, 478 F.3d 836, 841 (7th Cir. 2007)).  The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act.[2] *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008). A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a

---

[2]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

Plaintiff argues that the ALJ's decision should be reversed because she: (1) made a flawed credibility assessment; (2) failed to provide adequate support for the RFC determination; and (3) relied on improper VE testimony.  The Court addresses each argument in turn.

### 1.    Plaintiff's Credibility

Plaintiff first argues that the ALJ erred in finding that his testimony regarding the limiting effects of his symptoms was "less than credible."  In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence.  *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007).  If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record."  *Id.  See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004).  Because hearing officers are in the

best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong."  *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

As a preliminary matter, the Court notes that the ALJ included the following language in her credibility analysis:  "I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [stated] residual functional capacity assessment." (R. 16).  The Seventh Circuit has repeatedly criticized this template as "unhelpful" and "meaningless boilerplate," but ALJs continue to use it in their decisions. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).  Each time they do so, plaintiffs and their counsel seize on the language as evidence that the credibility finding is backwards and defective.  *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (the template "implies that ability to work is determined first and is then used to determine the claimant's credibility.  That gets things backwards.").

The Court agrees that the "hackneyed language seen universally in ALJ decisions adds nothing" to a credibility analysis.  *Shauger*, 675 F.3d at 696. Where, as here, however, the ALJ provides a detailed discussion of the plaintiff's symptoms and testimony, and the reasons he did not find the plaintiff's statements fully credible, the use of the boilerplate template does not alone provide a basis for remand.  *See, e.g., Richison v. Astrue*, 462 Fed. App. 622, 625 (7th Cir. 2012) (the boilerplate language is "inadequate, by itself, to support a

credibility finding," but decision affirmed where "the ALJ said more."). Plaintiff's argument to that effect is rejected.

Turning to the ALJ's substantive analysis, she first observed that the medical evidence does not support Plaintiff's complaints of disabling limitations. Plaintiff was diagnosed with calcaneal spurs in both feet in July 2008, but there was no evidence of acute fracture or dislocation. (R. 17, 327). The same month, Plaintiff complained to Dr. Smith of "some numbness" in his ankles and feet, but it had improved by November 2008, and he did not mention it again until July 2009, when he sustained an injury to his right calf. At that time, Dr. Smith observed "some" swelling and "mild" tenderness, and described Plaintiff's pain as "mild." She referred him to an orthopedist, but he never went. (R. 17, 315, 583).

A May 2009 EMG of Plaintiff's legs did show "evidence of motor and sensory polyneuropathy," and a July 2009 X-ray revealed a small radiopaque foreign body in the right leg. (R. 17, 306, 554). Plaintiff had normal blood flow, however, and there was no evidence of deep vein thrombosis. (R. 555). When Plaintiff saw Dr. Rafiq in August 2009, he had no problem getting on and off the exam table; he could walk more than 50 feet without support; his gait was non-antalgic; a straight leg raise test was negative bilaterally; and he had normal range of motion. (R. 17-18, 561). In November 2009, the swelling in Plaintiff's right leg had disappeared, "provocative tests" were negative, and he had full strength of 5 out of 5. (R. 583, 601). By February 2010, the calf injury had healed on its own. (R. 18-19, 583, 599). When Plaintiff went to the emergency room in August 2010, moreover, an ultrasonograph was normal. (R. 19, 620).

As for Plaintiff's carpal tunnel syndrome, he was diagnosed with the condition in August 2008, (R. 17, 304), but then did not mention it until April 2009 when he sprained his left wrist and started wearing a brace. An X-ray taken at that time was negative, and Dr. Smith observed minimal swelling, good range of motion, and full strength. Indeed, she instructed Plaintiff to gradually "return to normal use of wrist/decrease splint use." (R. 309). In August 2009, Dr. Rafiq noted that while Plaintiff had positive Tinel's and Phalen's signs, he also had normal grip strength in both hands, and normal ability to grasp and manipulate objects. (R. 561). Plaintiff subsequently scheduled wrist surgery for September 2009, but there is no evidence that he had the procedure. Nor did he ever pursue treatment at a hand clinic despite a July 2009 referral from Dr. Smith. (R. 583).

The only medical evidence that supports Plaintiff's claim of disability is Dr. Smith's December 2009 RFC assessment that he cannot engage in competitive employment due to "significant upper and lower extremity neuropathy" and "significant carpal tunnel syndrome." (R. 594-95). The ALJ discussed this opinion, but discounted it as inconsistent with Dr. Smith's own treatment notes and the medical evidence as a whole. (R. 19). Notably, Plaintiff does not challenge this aspect of the ALJ's decision.

Consistent with the requirements of SSR 96-7p, the ALJ went on to address Plaintiff's testimony regarding his sharp and constant knee pain, his shortness of breath and pain when walking up stairs, his use of prescription ibuprofen for pain, his need to rub and elevate his legs, his trouble sleeping and

tendency to fall when getting out of bed due to leg numbness, his difficulty walking and standing, and his inability to help with dishes due to hand numbness. (R. 16). The ALJ then provided several reasons for discounting this testimony. First, Plaintiff left his job as a chef when he was fired over a scheduling issue, and not due to his medical conditions. For nearly two years afterwards, he collected unemployment insurance, holding himself out as being capable of working. (R. 20). *See Miocic v. Astrue*, __ F. Supp. 2d __, 2012 WL 4006704, at *12 (N.D. Ill. Sept. 5, 2012) ("It is not inappropriate to consider a claimant's unemployment income in a credibility determination."). In addition, Plaintiff received essentially "routine and conservative" treatment, and never rescheduled his carpal tunnel surgery despite claiming to have disabling pain. (R. 20).

Plaintiff does not address any of these findings. Rather, he objects that the ALJ failed to indicate which portions of his testimony she found "less than credible." (Doc. 22, at 7; Doc. 28, at 2). The Court disagrees. As Defendant notes, the ALJ imposed additional RFC limitations based specifically on Plaintiff's testimony. (Doc. 27, at 6). Giving Plaintiff "the benefit of the doubt," the ALJ limited him to work that: allows for a sit/stand option; requires only occasional climbing of ramps and stairs; requires no climbing of ladders, ropes or scaffolds, and no walking on uneven, rough surfaces; involves no more than frequent fingering; and involves no concentrated exposure to excessive vibration. (R. 19). Dr. Gotway's RFC assessment, the only one remaining after the ALJ rejected Dr. Smith's unreliable evaluation, contains far fewer restrictions. The ALJ explained, however, that the additional exertional, manipulative and environmental

restrictions take into account Plaintiff's statements regarding the effects of his bone spurs, neuropathy, knee pain and edema, and carpal tunnel syndrome. In other words, "[i]t was because of and not in spite of [Plaintiff's] testimony that the ALJ limited h[im] to a more restrictive residual functional capacity." *Castile*, 617 F.3d at 929.

Plaintiff argues that the case must still be remanded because the ALJ failed to mention important pieces of evidence, including: (1) his testimony that he cannot mop, shop or do laundry; (2) a comment from the Social Security Administration Field Officer who interviewed him on September 14, 2009 regarding his application for benefits that he "complained of pain and was moving around his chair to find comfort" (R. 216); and (3) a handwritten note from his fiancée indicating that when she lived with him, she had to do most of the housework because he was in "almost constant pain." (R. 138; Doc. 22, at 8). This argument is unavailing.

It is well-established that an ALJ "is not required to address every piece of evidence or testimony presented." *Kastner v. Astrue*, 697 F.3d 642, 2012 WL 4799021, at *3 (7th Cir. 2012). Here, the ALJ discussed Plaintiff's own testimony that: he cannot sit for more than 30 minutes or stand for more than 10 or 15 minutes at a time due to pain, discomfort and numbness; he cannot help do dishes; and his prescribed medications "have not been effective in treating the pain in his legs, feet, arms or hands." (R. 16). On this record, the ALJ's failure to specifically mention every household chore Plaintiff cannot perform, or to cite

corroborating statements from the Field Officer and Plaintiff's fiancée, does not constitute reversible error.

Nor did the ALJ err in analyzing Plaintiff's stated need to elevate his legs several times a day. (Doc. 22, at 9). The ALJ expressly noted Plaintiff's testimony in that regard, as well as evidence that he suffers from polyneuropathy and numbness. No physician, however, ever suggested that Plaintiff needs to elevate his legs as a result of these conditions, much less that he must do so several times a day for an hour at a time. *Cf. Catchings v. Astrue*, 769 F. Supp. 2d 1137, 1146 (N.D. Ill. 2011) (plaintiff testified that he "elevates his feet at waist height for his back pain, on the advice of an emergency room doctor."); *Ellis v. Astrue*, No. 2:09 CV 145, 2010 WL 3782265, at *15 (N.D. Ind. Sept. 20, 2010) (treating physician and medical expert "were consistent in their opinions that [the plaintiff] needed to elevate her legs."). In the absence of any medical support for Plaintiff's stated need to elevate his legs, the ALJ reasonably declined to accept this aspect of his testimony.

Viewing the record as a whole, the ALJ's credibility determination was not patently wrong and does not support remanding this case. *Castile*, 617 F.3d at 929.

### 2. The RFC Determination

Plaintiff next argues that the ALJ's RFC determination is flawed because it is neither supported by the medical evidence nor adequately explained in the decision. A claimant's RFC is the maximum work that he can perform despite any limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. The RFC determination

is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(d)(2). "When determining the RFC, the ALJ must consider all medically determinable impairments, . . . even those that are not considered 'severe.'" *Craft*, 539 F.3d at 676.

Plaintiff contends that the RFC determination cannot stand because it is "utterly without medical basis." (Doc. 22, at 11). This argument is premised on Plaintiff's belief that the ALJ "relied on no medical opinions" at all but instead made up her own RFC out of whole cloth. (*Id.*). He cites to cases where an ALJ "[e]liminated the field of available RFC medical evidence" because it was deficient, and then "constructed a 'middle ground' and came up with her own physical RFC assessment." *Bailey v. Barnhart*, 473 F. Supp. 2d 822, 838-39 (N.D. Ill. 2006). *See also Suide v. Astrue*, 371 Fed. Appx. 684, 690 (7th Cir. 2010) (where the ALJ's rejection of medical opinions left an "evidentiary deficit," it was "unclear . . . how the ALJ concluded that [the plaintiff] could stand and/or walk for six hours a day."); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (ALJ erred by stating that she based her RFC on the opinion of a state agency consultant where that doctor never suggested that the plaintiff could stand for 6 hours or lift up to 20 pounds).

The problem for Plaintiff is that the ALJ did not reject all of the available RFC medical evidence in this case, but only the RFC supplied by Dr. Smith. The ALJ gave "great weight" to Dr. Gotway's RFC, and agreed with his assessment

that Plaintiff is capable of performing at least light work.[3]  (R. 15, 19, 565).  For similar reasons, there is no merit to Plaintiff's complaint that the ALJ imposed fingering, but not handling limitations even though Dr. Smith found him incapable of both activities.  (Doc. 22, at 13).  Dr. Gotway found that Plaintiff has no manipulative limitations whatsoever, (R. 567), and there is nothing improper about the ALJ's decision to impose some additional restrictions based on Plaintiff's testimony.  (R. 19).  *See also Castile*, 617 F.3d at 929.

The same cannot be said of the ALJ's failure to account for Plaintiff's obesity in determining his RFC.  The Seventh Circuit has made it clear that "[a]n ALJ must factor in obesity when determining the aggregate impact of an applicant's impairments."  *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012).  The medical records reflect that since July 30, 2008, Plaintiff has had a BMI ranging from 32 to 40.[4]  (R. 309-11, 314, 315, 582-83, 599, 601).  On September 14, 2009, Dr. Smith indicated that she was "concerned about [Plaintiff's] weight gain," (R. 582), and on February 17, 2010, she officially diagnosed him with obesity.[5]  (R. 599).  The ALJ, however, never mentioned Plaintiff's weight, or considered how it may have exacerbated his impairments.  As the *Arnett* court recently observed, "[i]f the ALJ thought that [Plaintiff's] obesity has not resulted in limitations on h[is] ability to work, [s]he should have explained how [s]he reached

---

[3]     It is worth repeating that Plaintiff does not challenge the ALJ's decision to reject Dr. Smith's opinion in favor of Dr. Gotway's.

[4]     For adults, a BMI of 30 or higher is considered obese. (http://www.cdc.gov/obesity/adult/defining.html, last viewed on November 7, 2012).

[5]     At the time of his diagnosis, Plaintiff was 5'9" tall and weighed 267.2 pounds, giving him a BMI of 40.  (R. 599).

that conclusion." 676 F.3d at 593. *See also Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (SSR 02-1p requires an ALJ to assess the effect of obesity on a claimant's limitations "because, for example, a person who is obese and arthritic may experience greater functional limitations than a person who is only arthritic."). The ALJ's duty in this regard exists even where, as here, Plaintiff "failed to provide evidence of limitations" relating to his obesity. *Arnett*, 676 F.3d at 593.

Defendant responds that the ALJ indirectly considered Plaintiff's obesity by relying on the opinion from Dr. Gotway, who expressly noted Plaintiff's height and weight. (Doc. 27, at 9; R. 571). It is true that an ALJ's failure to mention a claimant's obesity may be a harmless error if she "predicated h[er] decision upon the opinions of physicians who did discuss [the claimant's] weight." *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006). Here, even though Dr. Gotway mentioned Plaintiff's height and weight, he said nothing about BMI. Moreover, Dr. Gotway evaluated Plaintiff in September 2009, several months before Dr. Smith diagnosed him with obesity in February 2010. As a result, Dr. Gotway could not have taken that diagnosis into account in assessing Plaintiff's RFC. Given that the ALJ gave little weight to Dr. Smith's RFC opinion, there is no basis for concluding that the ALJ "adopt[ed] limitations suggested by physicians who were aware of or discussed [Plaintiff's] obesity." *Arnett*, 676 F.3d at 593. Thus, the case must be remanded to allow the ALJ to explain how Plaintiff's obesity factors into the aggregate impact of his impairments.

### 3.    The VE's Testimony

Plaintiff finally argues that the ALJ made an additional error in accepting the VE's testimony that a person with Plaintiff's RFC can work as a housekeeper or cafeteria attendant, even if he requires a sit/stand option.  (R. 71, 73).  Looking at the job descriptions set forth in the Dictionary of Occupational Titles, Plaintiff asks the Court to apply its common sense and recognize that an employee could not reasonably expect to be able to sit down every 10 minutes and still remain employed in these positions.  (Doc. 22, at 16) (citing *Gilbert v. Astrue*, No. 09 C 7028, 2010 WL 4074276, at *13 (N.D. Ill. Oct. 8, 2010) (district court declined to "set aside its common sense" and "reject[ed] the idea that a short order cook working the grill or hot line in a typical casual dining establishment will not be regularly exposed to on-the-job smoke or airborne irritants.").

Plaintiff's argument is unavailing because he ignores the fact that the ALJ and the VE also found him capable of working as a cashier.  Even assuming that the housekeeper and cafeteria positions are not available to Plaintiff, he does not dispute that there are at least 75,000 cashier jobs that would accommodate a sit/stand option.  This constitutes a substantial number of jobs and supports the ALJ's step 5 determination.  *See Coleman v. Astrue*, 269 Fed. Appx. 596, 2008 WL 695045, at *5 (7th Cir. Mar. 14, 2008) (citing *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993)) ("1,400 jobs falls within the parameters of a sufficiently significant occupational base.").  *See also Hastings v. Astrue*, No. 08 C 5041,

2010 WL 1609963, at *9 (N.D. Ill. Apr. 16, 2010). Plaintiff's request for remand based on the VE's testimony is therefore denied.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 21) is granted, and Defendant's Motion for Summary Judgment (Doc. 26) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: November 16, 2012

SHEILA FINNEGAN
United States Magistrate Judge